## APPEAL OF BELL LUMBER CO.

Docket No. 961.   Submitted March 24, 1925.   Decided September 9, 1925.

> Upon the evidence, *held*, that the taxpayer falsely and fraudulently understated its income, with intent to evade the tax.

*H. A. Mann, Esq.*, for the taxpayer.
*C. H. Curl, Esq.*, for the Commissioner.

Before STERNHAGEN, TRUSSELL, and PHILLIPS.

The Commissioner determined a deficiency in income and profits taxes of $5,834.95 and a penalty of $2,896.07 for the year 1918, and a deficiency in income and profits taxes for the year 1920 of $1,340.33. The taxpayer appealed from the deficiency determination for the year 1918.

In that year the taxpayer sold certain timber and timber rights in tracts of land in Bladen County, S. C.   The consideration was paid partly in cash and notes and in part by $50,000 par value of capital stock of the White Lake Lumber Co.   The taxpayer alleged that the Commissioner's valuation of this stock was too high.   At the hearing counsel for the taxpayer withdrew the allegations relating to the valuation of the stock, thus leaving for consideration only the penalty.

The penalty asserted was based on the Commissioner's finding that the taxpayer, with intent to evade the tax, omitted to report that part of the profit from the timber sold represented by the shares of stock of the White Lake Lumber Co.

### FINDINGS OF FACT.

The Bell Lumber Co. is a South Carolina corporation with its principal office at Marion.

The shares of stock of the corporation were owned one-half by Charles W. Bell, one share by S. Earl Bell, and the balance by J. Scott Bell.   The stock owned by the latter was held in the name of S. Earl Bell.   S. Earl Bell is a son of J. Scott Bell.

On March 16, 1918, the Bell Lumber Co. entered into a written contract to sell to William A. Danzer and certain other persons who were associated with him " timber, timber rights, privileges, and easements in and to all those several tracts of timber " therein described, situated in Bladen County, S. C.   These properties were owned by the taxpayer.   The purchase price was $120,000 and was to be paid, $40,000 in cash, $30,000 in notes, and $50,000 in shares of capital stock at par of a corporation proposed to be formed by Danzer and his associates.   This stock, by the terms of the contract, was to be issued to the Bell Lumber Co. or its nominees.

The cash payment of $40,000 was made and the notes for $30,000 were delivered in 1918. Thereafter, in 1918, the proposed corporation was organized under the name White Lake Lumber Co., and $50,000 par value of its shares of capital stock were issued. At the request of Charles W. Bell and J. Scott Bell, the certificates of this stock were issued, $25,000 to Charles W. Bell and $25,000 to S. Earl Bell. The shares issued to S. Earl Bell were held by him for J. Scott Bell.

The stock issued to Charles W. Bell carried with it the guaranty or promise of Danzer and his associates to repurchase the same at par, with interest at 6 per cent, at the end of 12 months from the date of execution of the conveyance of the timberlands. This stock subsequently was taken over by Danzer and his associates on the terms mentioned. The $25,000 of stock issued in the name of S. Earl Bell was sold by J. Scott Bell to Danzer in February, 1919, for $15,000.

There was a journal entry in the taxpayer's books crediting the sum of $70,000 to timber and debiting it to cash. This is the amount received in cash and in payment of the notes under the contract of March 16, 1918. There was no explanation in any of the accounts of the character of the entry. The $50,000 of stock of the White Lake Lumber Co. was not entered in the books of the taxpayer and was not included in the return made by the taxpayer for the year 1918, nor was any part of it reported in the individual returns either of Charles W. Bell or of J. Scott Bell.

On March 16, 1918, J. Scott Bell was president of the Bell Lumber Co., and on May 14, 1919, the date of verification of the 1918 return, Charles W. Bell was president and S. Earl Bell was treasurer.

A conversation took place between J. Scott Bell and William A. Danzer in the latter part of 1918, or shortly after the 1st of January, 1919, in which the question of the probable tax liability resulting from the timber sale was discussed. There is a sharp conflict in the testimony as to what was said at that conversation, but that it took place is undisputed; and we therefore find that, several months after the sale and before the making of the tax return, J. Scott Bell's attention was directed to the subject of the tax.

Upon all of the evidence we find that the taxpayer understated its income falsely and fraudulently with intent to evade the tax.

### DECISION.

The determination of the Commissioner is approved.

### OPINION.

STERNHAGEN: After hearing all of the witnesses for both the taxpayer and the Commissioner, we have reached the conclusion that

this corporation through its officers willfully omitted from its tax return for 1918 a substantial item of its income, with the intent to evade its proper tax. The evidence relied upon by the corporation was the simple statement of its president that he never intentionally caused a fraudulent return to be made or suggested or intimated this to anyone else. The circumstances, however, are quite convincing to the contrary. All of these men knew that the corporation was selling the timber rights upon the tract for approximately $120,000. They were not selling timber in the sense covered by the timber account, but were selling the timber rights to the tract as a whole, and for this they were receiving $40,000 in cash, $30,000 in short-time notes, and $50,000 in stock of the newly formed White Lake corporation. That they actually received this consideration in full is indubitable. The fact that the stock was issued directly to Charles W. Bell and S. Earl Bell makes it none the less part of the consideration received by the corporation.

At the time of the transaction J. Scott Bell, if none of the others, was fully aware that the tax aspects would require consideration. Notwithstanding this the sale was shown on the books of account in a manner that leaves no doubt of the intention to conceal it from the taxing authorities. A bare journal entry was made debiting cash and crediting "timber" in the amount of $70,000. This journal entry carried with it no explanation. The $50,000 of stock was omitted from the books entirely. It was only by dint of outside investigation that the fact of its receipt was discovered. No reference was made to this item on the tax return, either by way of including it in gross income or explaining its exclusion. The tax return would on its face give no inkling that such an item ever existed. The only explanation given at the hearing for this extraordinary treatment of such a substantial item was that they regarded the stock as worthless, although prior to the date when the return was filed the stock of J. Scott Bell, held by his son, was redeemed for $15,000. J. Scott Bell signed the return and he can not be heard to say, as he testified at the hearing, that these matters were left to his bookkeeper or some one else. The signature and oath upon a return is not an empty form. Its purpose is to fix responsibility, and a sham oath is just as reprehensible as a complete personal misstatement.

We think, after having heard all of the witnesses, that this is a clear case of fraud with intent to evade the tax and that the Commissioner therefore properly and lawfully included the penalty within his determination of a deficiency.

ARUNDELL not participating.